IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

ISAIAH LEWIS,
Petitioner,

v.   Civil No. 3:24cv101 (DJN)

CHADWICK DOTSON,
Respondent.

**MEMORANDUM OPINION**

Isaiah Lewis ("Petitioner"), a Virginia prisoner proceeding with counsel, brings this petition pursuant to 28 U.S.C. § 2254 ("§ 2254 Petition," ECF No. 1), challenging his convictions in the Circuit Court for the County of Chesterfield ("Circuit Court") for rape and object sexual penetration.[1] Lewis contends that he is entitled to relief on the following grounds:

| | |
|---|---|
| Claim A | "The state court erred in ruling that Lewis failed to establish that trial counsel rendered deficient performance in failing to properly advise him regarding plea offers prior to trial." (ECF No. 2, at 9.) |
| Claim B | "Lewis was prejudiced by trial counsel's failure to repeatedly advise him regarding specific, severe outcomes Lewis could face by declining the plea." (*Id.*) |
| Claim C | "But for trial counsel's ineffectiveness, Lewis would have accepted the Commonwealth's offer and the court would have accepted a plea offer that would have granted his near-immediate release." (*Id.*) |
| Claim D | "The state court erred in entering a guilty finding in Lewis' case because there was insufficient evidence to convict him." (*Id.*) |

Respondent has moved to dismiss. (ECF No. 6.) For the reasons set forth below, the Motion to Dismiss (ECF No. 6) will be GRANTED.

---

[1] The Court corrects the capitalization, spelling, and punctuation and omits unnecessary quotation marks in the quotations from the parties' submissions. The Court employs the pagination assigned by the CM/ECF docketing system.

## I. PERTINENT PROCEDURAL HISTORY

Following a jury trial, Lewis was convicted in the Circuit Court of rape and object sexual penetration. (ECF No. 10-1, at 15.) Lewis was sentenced to an active sentence of imprisonment of twenty years. (*Id.* at 16.) Lewis appealed. The Court of Appeals of Virginia denied his petition for appeal. (*Id.* at 29.) On September 8, 2020, the Supreme Court of Virginia refused Lewis's petition for appeal. (ECF No. 10-2, at 150.)

Lewis, with counsel, filed a petition for a writ of habeas corpus with the Circuit Court wherein he claimed that he received ineffective assistance of counsel in conjunction with the plea offers extended by the prosecution. (ECF No. 10-4, at 17.) The Circuit Court denied the petition for a writ of habeas corpus in a detailed opinion. (ECF No. 10-5.) Lewis appealed. The Supreme Court of Virginia refused the appeal. (ECF No. 10-7, at 39.)

## II. APPLICABLE CONSTRAINTS UPON FEDERAL HABEAS REVIEW

To obtain federal habeas relief, at a minimum, a petitioner must demonstrate that he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") further circumscribes this Court's authority to grant relief by way of a writ of habeas corpus. Specifically, "[s]tate court factual determinations are presumed to be correct and may be rebutted only by clear and convincing evidence." *Gray v. Branker*, 529 F.3d 220, 228 (4th Cir. 2008) (citing 28 U.S.C. § 2254(e)(1)). Additionally, under 28 U.S.C. § 2254(d), a federal court may not grant a writ of habeas corpus based on any claim that was adjudicated on the merits in state court unless the adjudicated claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The Supreme Court has emphasized that the question "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams v. Taylor*, 529 U.S. 362, 410 (2000)). Given the above standard, the opinions of the Virginia courts figure prominently in this Court's opinion.

### III. SUFFICIENCY OF THE EVIDENCE

A federal habeas petition warrants relief on a challenge to the sufficiency of the evidence only if "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). The relevant question in conducting such a review is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)). The critical inquiry on review of the sufficiency of the evidence to support a criminal conviction is "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Id.* at 318.

In rejecting Lewis's challenge to the sufficiency of the evidence, the Court of Appeals of Virginia aptly summarized the evidence as follows:

> On the morning of February 2, 2017, the victim, Z.S., was a fifteen-year-old high school student attending her second period class. Appellant[2] sent Z.S. a message via Snapchat and asked her if she was "trying to smoke" marijuana. Z.S. knew of appellant from her boyfriend, but "never had any encounter with him before." Z.S. agreed, and left school to meet up with appellant. Appellant brought Z.S. to his townhouse, and they smoked a joint in the backyard in a "red tent" for approximately "[f]ifteen minutes." Appellant claimed he "heard somebody," and brought Z.S. inside the residence and up to his room.

---

2  Appellant was sixteen years old on that date.

3

Z.S. and appellant sat on his bed, and appellant began "tugging [her] shoulder, [her] arm and [she] just laid down beside him." Appellant asked Z.S. if she was tired, and he "pulled the covers back on the bed." Appellant took Z.S.'s shoes off, then pulled down his pants and put her hand on his penis. Z.S. told appellant "no," and stated that she had a boyfriend. Appellant responded that her boyfriend did not have to know. Appellant "started tugging at [her] leggings" while lifting Z.S.'s legs up, and pulled her leggings and underwear all the way off. Appellant put his fingers in Z.S.'s vagina and forcibly opened her legs with his arm despite her efforts "to get them together." Appellant then "stuck his penis in [her] vagina." Z.S. began crying, and appellant put a pillow over her face. Z.S. testified that she unsuccessfully tried to push appellant off her and that appellant stopped when he ejaculated. Z.S. did not scream or yell "because [she] was scared" that appellant would hurt her, and she could not talk after the encounter because she "was in shock." Z.S. stayed in appellant's room "for about 15 minutes, just crying and just looking blank." Z.S. testified that she stayed because she was scared and "just couldn't believe what happened." Appellant and Z.S. left the house, and appellant walked her halfway back to school. Z.S. told several people what appellant had done, including her friend K.W., K.W.'s mother, her boyfriend, the police, and a nurse.

On cross-examination, Z.S. denied sending appellant's girlfriend "taunting" text messages while smoking marijuana outside with appellant. Z.S. initially denied that she had removed her own shirt during the encounter; however, in an interview conducted by Detective Baldwin, Z.S. stated that she, not appellant took off her shirt. Z.S. then agreed that she had voluntarily removed her shirt, and had forgotten that she had done so. Z.S. testified that she "got the two mixed up" when questioned about a prior statement concerning whether appellant penetrated her with his fingers before having sex with her. When confronted with her testimony from the preliminary hearing, Z.S. clarified that she did not yell during the encounter because appellant "put the pillow over my mouth." Z.S. confirmed that she did not immediately call the police and did not seek help from anybody else at appellant's residence. Z.S. admitted that her testimony was different than what she told the police concerning when she had told her friend K.W. what occurred between her and appellant.

K.W.'s mother testified that Z.S. spoke with her the day after Z.S.'s encounter with appellant, and recounted that Z.S. told her that appellant "tried to penetrate her with his member, didn't succeed," then used his hand. Ashley Howdyshell, a forensic nurse, testified that she examined Z.S. the day after the encounter and that Z.S. was interviewed in connection with the exam. Howdyshell testified that Z.S. stated that appellant "tried to put his penis in [her] vagina. It wouldn't go in and [she] was having pain." Z.S. further stated that she was "almost raped yesterday" and that appellant "started to finger [her] in [her] vagina. He tried to force himself in [her] again. [She] kept trying to push him off." Z.S. was unsure in the interview whether appellant ejaculated but suspected he did "because there was a wet spot on the bed." Howdyshell swabbed dried white fluid from Z.S.'s outer labia majora and perineum, and subsequent testing confirmed the presence of a spermatozoon consistent with appellant's DNA profile. A spermatozoon was also identified on the vaginal cervical swab;

4

appellant could not be eliminated as a contributor of the DNA in the sperm fraction of the spermatozoon. Howdyshell stated that a forensic exam cannot determine whether a person participated in consensual or nonconsensual sex, or whether a person was digitally penetrated.

Chesterfield County Police Detective Elwood Baldwin interviewed appellant in the presence of his mother on March 23, 2017 and April 7, 2017. Appellant denied any sexual contact with Z.S., and denied that Z.S. had ever been inside his house.

K.W. testified for the defense and stated that she "used to be friends" with Z.S., but that "[w]e are not friends anymore." K.W. stated that Z.S. initially called her crying shortly after the encounter and said that appellant raped her, but "[w]eeks after" stated that Z.S. admitted she lied about being raped. K.W. admitted that she never told Detective Baldwin that Z.S. said she was lying, despite being interviewed by Detective Baldwin on April 5, 2017, several weeks after Z.S. purportedly told her that she was lying. On re-direct, K.W. changed her testimony and stated that she met with Detective Baldwin before Z.S. told her that she was lying.

Appellant's aunt, Latisha Pritchett, testified that she was at the townhouse the day of the encounter and saw Z.S. try to "sneak out the house" without being seen. According to Pritchett, Z.S. was not in tears and did not look "like anything was wrong." Appellant's girlfriend, A.H., testified that she received text messages from Z.S. the day after the encounter. The Commonwealth objected to the introduction of the content of the text messages, and the trial court sustained the objection. The trial court limited the scope of A.H.'s testimony concerning any text messages to her statement that she received text messages from Z.S.

Appellant testified on his own behalf that he engaged in consensual sex with Z.S., but denied ever using his fingers to penetrate her, using force, or placing a pillow on her face. Appellant testified that he asked Z.S. in his bedroom after smoking marijuana outside: "[c]an we have sex. She was like, yeah." Appellant admitted on cross-examination that he repeatedly lied to Detective Baldwin during his interviews on March 23, 2017, and April 7, 2017, when he denied any sexual contact with Z.S. and claimed that Z.S. had never been inside his house.

. . .

Viewed in the light most favorable to the Commonwealth, Z.S.'s testimony was sufficient for the jury to conclude that appellant was guilty beyond a reasonable doubt of rape and object sexual penetration. Z.S. testified that, against her will, appellant put her hand on his penis and "started tugging at [her] leggings" while lifting Z.S.'s legs up, and pulled her leggings and underwear all the way off. Z.S. stated that appellant put his fingers in her vagina and forcibly opened her legs with his arm despite her efforts "to get them together." Appellant then "stuck his penis in [her] vagina." When Z.S. began crying, appellant put a pillow over her face, and she unsuccessfully tried to push appellant off her. DNA consistent with appellant was present in Z.S.'s vaginal swabs. Appellant himself admitted that he had intercourse with Z.S.; he claimed that the sexual contact was consensual. A reasonable conclusion from Z.S.'s testimony, the forensic evidence, and appellant's own admission, was that appellant penetrated Z.S.'s

5

vagina with his penis. *See Elam v. Commonwealth*, 229 Va. 113, 115 (1985) ("Penetration by a penis of a vagina is an essential element of the crime of rape[.]"); *Love v. Commonwealth*, 18 Va. App. 84, 88 (1994) (finding that "penetration of any portion of the vulva—which encompasses the 'external parts of the female sex organs considered as a whole' and includes, beginning with the outermost parts, the labia majora, labia minora, hymen, vaginal opening and vagina—is sufficient to show penetration" (citation omitted)). Z.S. also testified that appellant put his fingers in her vagina. Z.S.'s testimony permitted the jury to find that appellant penetrated her vagina with both his penis and fingers, by force or intimidation, and against her will.

. . .

The jury resolved any inconsistencies in Z.S.'s testimony in favor of the Commonwealth, and we will not disturb that finding on appeal. The Commonwealth's evidence was competent, was not inherently incredible, and was sufficient to prove beyond a reasonable doubt that appellant was guilty of rape and object sexual penetration.

(ECF No. 10-2, at 126–31.) The above-described evidence amply supports Lewis's convictions for rape and object sexual penetration. Accordingly, Claim D will be DISMISSED.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

To demonstrate ineffective assistance of counsel, a convicted defendant must show, first, that counsel's representation was deficient, and second, that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To satisfy the deficient performance prong of *Strickland*, the convicted defendant must overcome the "'strong presumption' that counsel's strategy and tactics fall 'within the wide range of reasonable professional assistance.'" *Burch v. Corcoran*, 273 F.3d 577, 588 (4th Cir. 2001) (quoting *Strickland*, 466 U.S. at 689). The prejudice component requires a convicted defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In analyzing ineffective assistance of counsel claims, it is not necessary to determine whether counsel performed deficiently if the claim is readily dismissed for lack of prejudice. *Id.* at 697.

6

In conjunction with his state habeas petition, Lewis submitted his own affidavit wherein he stated:

> On July 9 of 2018, I was tried, by a jury, for one (1) count of rape and one (1) count of inanimate sexual penetration. I was seventeen (17) years old at the time I was charged, and I was held in pretrial detention at the Chesterfield County Juvenile Detention Home with limited ability to discuss my situation in detail with my guardian.
>
> Prior to July 9, 2018, I had never been tried in a Circuit Court or participated in a jury trial. Attorney Baez did not take the time to explain the proceedings or provide detail about the significant risks I faced if I proceeded with a trial. It is my understanding this was the first time Attorney Baez had tried a case this serious in nature before a Circuit Court.
>
> While my case was pending in the Juvenile and Domestic Relations District Court, my lawyer, Jesse A. Baez, visited me approximately 4 times. These visits were brief, lasting no more than 10 minutes.
>
> On March 19, 2018, the Grand Jury returned true indictments, I was denied bond by the Chesterfield Circuit Court on March 23, and my trial by jury began on July 9, 2018.
>
> On or about June 28, 2018, I was informed by Attorney Baez of an offer made by the Commonwealth. At that time, he told me in consideration for entering a guilty plea, I would be convicted of two (2) charges, one (1) of which would be a felony. Attorney Baez said the Commonwealth agreed to a sentence which would include a twelve (12) month period of active incarceration, upon my conviction I would never be able to vote or carry a firearm, and I would be required to register as a sex offender. Attorney Baez told me I should consider this offer and contact him with my answer. I told him, "No."
>
> On or about July 6, 2018, Attorney Baez advised the Commonwealth had amended their offer, and if accepted, I would be released from the Chesterfield Detention Home that Friday. The agreement still included a felony conviction and required me to register as a sex offender.
>
> Attorney Baez did tell me it was a good offer and if I went to trial and was convicted, I could be sentenced to twenty (20) or more years in prison. However, he did not go to any lengths to convince me to accept it and failed to provide detail regarding specific, severe outcomes I could face by declining the plea. During this brief discussion, Attorney Baez advised that my chances of winning were 50-50, the case could go either way, he believed we had a chance and there was even a good possibility the case would be nolle prossed the day of trial as the complaining witness did not want to participate in the proceedings. When Attorney Baez visited with me the day before trial, my recollection is the meeting lasted no more than 10 minutes.
>
> On the morning of the trial Mr. Baez met with me and advised we had a shot because at that time, the witness did not want to get on the stand. The witness did ultimately take the stand.
>
> During the first break, Attorney Baez met with me in private and told me things "were looking good," and, "we got this." During the second break,

> Attorney Baez and I met, and he said things were not looking good and presented me with another offer the Commonwealth had extended, which required that I go to the Department of Juvenile Justice until my 21st birthday.
>
> At one point during deliberations, the jury came into the courtroom with a question. After being presented with the question, the trial court went off the record and told the jury to do as they were instructed.
>
> Prior to my trial beginning, Mr. Baez did not explain the sentencing process, if I would be sentenced by the trial court or the jury, what sentencing guidelines were, or how they were calculated and used.
>
> "He didn't help me in his best hour because he never delt [*sic*] with a case like mine. Whenever he came to see me, it was always a short conversation, like he was in a rush. Mr. Baez and I met he always seemed to be in a hurry."

(ECF No. 10-4, at 26–28.) Lewis also submitted a Supplemental Affidavit, wherein he stated:

> Throughout his representation Mr. Baez told me that we had a very good chance if the case was tried. Mr. Baez did not explain the impact that my prior inconsistent statement might have on the jury's decision. Now I understand that the jury may well have interpreted my inconsistent statement regarding my encounter with the complaining witness as a strong indication that I was not being truthful. Mr. Baez did not show me the jury instruction on that issue, or any other jury instructions. Mr. Baez did not review my testimony with me prior to trial and did not prepare me for cross examination. Had Mr. Baez had taken the time to go through all of the evidence with me and the implications of my prior inconsistent statements to the police; and if he explained how that statement would very likely lead a jury to believe I was lying as well as explaining to me there was a good chance I might lose the case, I would have taken the offer extended by the Commonwealth prior to trial.

(*Id.* at 29.)[3]

Counsel, in turn, submitted his own, much more detailed affidavit.

> To begin with, I would like to address the claim by both Mr. Lewis and his mother regarding the amount of time I spent meeting with both of them. I have attached as an exhibit to this letter an itemization of the time I spent on Mr. Lewis' case. A copy of this worksheet should also be with the original court file, as I submitted a waiver for reimbursement for my court-appointed fees. I have listed the dates and amount of time I met with Mr. Lewis below. It should be noted this does not account for the times I met with Mr. Lewis prior to charges being certified in the Chesterfield Juvenile and Domestic Relations District Court:
> 1.    March 26th, 2018: met with client at the Chesterfield County Juvenile Detention Center for 24 minutes.

---

[3]    Lewis also submitted an affidavit from his mother. (ECF No. 10-4, at 32–33.)

8

2. April 5th, 2018: Met with client, his mother and step-father at the Chesterfield County Juvenile Detention Center for 1 hour.
3. April 25th, 2018: Met with client for 1 hour.
4. May 22nd, 2018: Met with client for 30 minutes.
5. June 7th, 2018: Met with client for 48 minutes to review a potential plea deal and sentencing guidelines.
6. June 15th, 2018: Met with client for 30 minutes.
7. June 19th, 2018: Met with client and his mother for 1 hour.
8. June 27th, 2018: Meet with client at detention center for 36 minutes.
9. July 5th, 2018: Met with client for 2 hours. I will discuss this meeting further below.
10. August 15th, 2018: Client meeting for 30 minutes.

Upon information and belief, these meetings would be reflected at the visitor logs with the Chesterfield County Detention Center, as I had to log in and out each time I left. Attached to Exhibit B is a copy of an advisement to accept a plea deal that Mr. Lewis signed. Unfortunately, due to the fact that I have since transitioned firms, I no longer have access to the physical file and the signed copy.

Throughout my representation of Mr. Lewis, I received significant pushback from his mother and step-father against accepting any sort of plea-deal. I believe her efforts are what convinced Mr. Lewis to ultimately reject all offers from the Commonwealth's Attorney. I am quite surprised that Ms. Lewis indicated she had very little communication with me. I had to make special arrangements with the superintendent of the Detention Center so that we could hold a three-way in person meeting between Mr. Lewis, his mother and myself. In fact, she was often the person reaching out to me whenever Mr. Lewis wished to speak with me about his case.

I had never informed either Mr. Lewis or his mother that this was a "slam-dunk" case. In fact, I had repeatedly urged Mr. Lewis to accept the plea deals offered throughout the course of my representation. One important point the habeas petition does not bring up is the fact that there were pending rape charges in the Chesterfield Juvenile and Domestic Relations District Court that were **separate and apart** from the charges that I represented Mr. Lewis on. This was not Mr. Lewis' first contact with the criminal justice system, and I was concerned throughout the case about this fact (in addition to the fact that he had lied to the police on several occasions). I filed a motion in limine as to this point on Mr. Lewis behalf. A consent order was entered to limit any reference to his previous criminal charges. A draft copy of the consent order is attached as "Exhibit C."

Several years have passed since I represented Mr. Lewis, so I do not remember every detail of what transpired. However, I believe the most significant events regarding the plea deal negotiations occurred immediately prior to trial. On July 5th, 2018, I met with Mr. Lewis for about two hours. The purpose of this meeting was not only to help him prepare for trial, but also to go over the most recent offer. The offer at that time, to the best of my recollection, was to amend the felonies down to misdemeanors and for Mr. Lewis to be released the following week. Part of his hesitation was the rape charge that was

9

still pending in the Chesterfield Juvenile and Domestic Relations District Court. In order to illustrate the risks of going to trial, I took out a coin and said to Mr. Lewis something along these lines: "Isaiah, going to trial is like flipping a coin. Heads you can go free, tails you can go to the penitentiary for 20 years. Don't play a game like this with your life." At one point during our meeting, Mr. Lewis seemed to want to accept the plea deal offered by the Commonwealth. We took a break, as Mr. Lewis indicated he wanted to call his mother. After he spoke with her on the phone, he stated he did not want to accept the deal.

On the day of trial, Mr. LaRuffa and Ms. Giuliano (the Commonwealth's Attorneys working on this case) approached me after having interviewed Ms. Weir regarding the statements the complainant had made to her. I specifically remember this because I can recall the beginning of the trial was delayed while Mr. LaRuffa and Ms. Giuliano spoke with the complainant and Ms. Weir. A revised offer was made where Mr. Lewis would be released, the charges would be amended to misdemeanors, and he would serve no additional time on the other charges pending in JDR. Mr. Lewis refused this offer. After the presentation of evidence, and after the jury presented its question, a revised offer was made by the Commonwealth. The offer was that if Mr. Lewis plead guilty to both charges, that the Commonwealth agree Mr. Lewis' commitment as a serious offender under Code Section 16.1-285.1. Despite my recommendations, Mr. Lewis refused this offer as well. Finally, to the best of my recollection, I would add that the fact that various plea deals were offered by the Commonwealth was put on the record by Mr. LaRuffa. Throughout my representation of Mr. Lewis, I repeatedly strongly urged him to take the reasonable offers put forward by the Commonwealth. Ultimately, I cannot force any client to take a course of action that they do not wish to take.

(ECF No. 10-9, at 1–9.)

The United States Court of Appeals for the Fourth Circuit has observed that, "[c]hoosing between conflicting affidavits without a hearing may be reasonable when one affidavit is cryptic or conclusory with respect to a contested issue of fact and the other affidavit sets out a detailed account of events." *Strong v. Johnson*, 495 F.3d 134, 139–40 (4th Cir. 2007) (citing *United States v. McAtee*, 481 F.3d 1099, 1103 (8th Cir. 2007); *United States v. Perez*, 393 F.3d 457, 464 (4th Cir. 2004)).[4] Here, Baez's detailed account of events is confirmed by his billing records, a the copy of the Plea Deal Acknowledgement provided to Lewis, and Lewis's consistent refusal

---

[4] In *Strong*, the Fourth Circuit concluded that the Supreme Court of Virginia did not act unreasonably when it accepted trial counsel's detailed account of events over his client's "cryptic" account. 495 F.3d at 140.

to acknowledge his guilt throughout his criminal proceeding. The United States Supreme Court has recognized that, in some instances, "expansion of the record will provide 'evidence against a petitioner's extra-record contentions . . . so overwhelming as to justify a conclusion that an . . . [allegation] does not raise a substantial issue of fact.'" *Blackledge v. Allison*, 431 U.S. 63, 82 n.25 (1977) (first omission in original) (quoting *Moorhead v. United States*, 456 F.2d 992, 996 (3d Cir. 1972)). That is the case here.

Therefore, the Circuit Court rejected Lewis vague statements that conflicted with the Circuit Court's own observations and counsel's detailed statements and records and concluded:

> The Court finds that Lewis has failed to establish that his counsel's performance was deficient in failing to properly advise him regarding plea offers prior to trial. Lewis's own affidavit show that the plea offers at issue were properly relayed and that he was adequately counselled regarding those plea offers. Lewis has also failed to show a reasonable probability that the outcome of the case would have been different had counsel continued to repeatedly advise him regarding "specific, severe outcomes [Lewis] could face by declining the plea." Lewis's actions before, during, and after trial all show that he knowingly rejected the Commonwealth's offers, repeatedly maintained his innocence, and failed to express any indication he would have been willing to accept the plea offers until his second affidavit. Lewis also failed to show that the Court would have accepted the plea offer that would have granted his near-immediate release.

### Standard of Review and Controlling Legal Principles

> The Sixth Amendment right to counsel "extends to the plea-bargaining process." *See Missouri v. Frye*, 566 U.S. 134, 140 (2012). Thus, criminal defendants are "entitled to the effective assistance of competent counsel" during that process. *Lafler v. Cooper*, 566 U.S. 156, 162 (2012) (internal quotation marks omitted), and the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984) governs such claims. *See Hill v. Lockhart*, 414 U.S. 52, 57 (1985).
> To prevail on his ineffective assistance claim, Lewis must establish that "(1) counsel's performance was deficient and (2) there is a reasonable probability that the deficiency prejudiced the defense." *Merzbacher v. Shearin*, 106 F.3d 356, 363 (4th Cir. 2013) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984)). An ineffective counsel claim may be disposed of on either prong because deficient performance and prejudice are "separate and distinct elements." *Spencer v. Murray*, 18 F.3d 229, 232–33 (4th Cir. 1994); *Strickland*, 466 U.S. at 697.

11

"The performance prong of *Strickland* requires a defendant to show 'that counsel's representation fell below an objective standard of reasonableness." *Lafler v. Cooper*, 566 U.S. 156, 162–63 (2012) (quoting *Hill v. Lockhart*, 474 U.S. 52, 57 (1985)); *see also Fuentes v. Clarke*, 290 Va. 432, 439, 777 S.E.2d 550, 553 (2015). Under this standard, "[t]he challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment.'" *Smith v. Brown*, 291 Va. 260, 266, 781 S.E.2d 744, 748 (2016) (quoting *Premo v. Moore*, 562 U.S. 115, 121–22 (2011)). "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.'" *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 105 (2011)).

In determining whether counsel's performance was deficient "judicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 266 U.S. at 688. Accordingly, "a [habeas] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.*

The second prong of the Strickland test, the "prejudice" inquiry, requires showing that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Id.*

In a case arising out of a rejected plea agreement, a petitioner must establish prejudice by showing a reasonable probability that he would have accepted the plea offer but for the objectively unreasonable conduct of trial counsel, that the prosecution would not have withdrawn the offer, and that the court would have accepted the petitioner's plea. *See Lafler v. Cooper*, 566 U.S. 156, 171 (2012). In making this determination, the Court "may take account of a defendant's earlier expressed willingness, or unwillingness, to accept responsibility for his or her actions." *Id.* If a plea colloquy has been conducted, "findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977) (quoted in *Smith v. Brown*, 291 Va. 260, 265 fn.4 (2016)). Courts should be extremely skeptical of a petitioner's post-sentencing claims regarding plea agreements because "[m]ore often than not, a prisoner has everything to gain and nothing to lose." *Blackledge*, 431 U.S. at 71–72.

"On both issues, deficient performance and prejudice, the petitioner bears the burden of proving his factual allegations 'by a preponderance of the evidence.'" *Smith*, 291 Va. at 268, 781 S.E.2d at 749 (quoting *Sigmon v. Director*, 285 Va. 526, 535, 739 S.E.2d 905, 909 (2013)).

Furthermore, a criminal defendant is bound by his statements at trial concerning the adequacy of his counsel and the voluntariness of his plea. *Anderson v. Warden*, 222 Va. 511, 516, 281 S.E.2d 885, 888 (1981) (discussing guilty plea colloquy); *see also Blackledge v. Allison*, 431 U.S. 63, 74 (1977) (same); *Beck v. Angelone*, 261 F.3d 377, 396 (4th Cir. 2001) (same). Thus, the truth and accuracy of the defendant's representations as to the voluntariness of his plea and the adequacy of his counsel "will be considered conclusively established

12

by the trial proceedings, unless the prisoner offers a valid reason why he should be permitted to controvert his prior statements." *Anderson*, 222 Va. at 516, 281 S.E.2d at 888; *see also Jones v. Taylor*, 541 F.2d 808, 810 (4th Cir. 1977) (applying principle to plea of not guilty); *Martin v. Warden*, 2 Va. App. 6, 341 S.E.2d 202 (1986) (applying presumption of verity to case tried on a "not guilty" plea).

. . .

### Analysis

In the sole claim raised in his petition, Lewis alleges that trial counsel was ineffective for failing to properly advise him of a plea offer from the Commonwealth. However, according to Lewis's own affidavit, he was properly advised of the Commonwealth's plea offer and the risks of rejecting it. Furthermore, the record and Affidavit of Counsel show that Lewis was determined to go to trial regardless of his attorney's recommendation, and Lewis has failed to show a reasonable probability that this Court would have accepted the plea agreement offered by the Commonwealth. *Strickland* presents a two-pronged test for assessing ineffective assistance of counsel, and Lewis fails to satisfy either prong.

All necessary information for deciding this motion is contained in the Court's record, the Affidavit of the Petitioner, and the attached Affidavit of Counsel. Accordingly, this petition should be dismissed without further hearing.

**I.   Lewis has not borne his burden to establish deficient performance as he was sufficiently advised of the plea offers and counselled regarding the offer's merit and the risks of trial.**

Even Lewis's own affidavit shows that he was informed of and properly counselled regarding the Commonwealth's offer. (Aff. of Pet'r 2). This is further confirmed by the Court's *voir dire* prior to trial and the Affidavit of Counsel. (Trial Tr. 10); (Aff. of Counsel 2-3 & Ex. B). Counsel *did* explain that Lewis's false statement to the police would hurt his case and stressed the risks of trial telling him, "[Y]our can go the penitentiary for 20 years. Don't play a game like this with your life." (Aff. of Counsel 2 & Ex. B). Counsel's advice was not objectively unreasonable in these circumstances. On the contrary, Counsel's actions not only met, but exceeded the standards set forth in *Lafler* and *Smith*. *See Lafler*, 566 U.S. at 162–63; *Smith*, 291 Va. at 266. Lewis seems to argue that Counsel should have browbeat him into accepting the offer, but the decision to plead guilty belongs to the defendant and the defendant alone. *Purdy v. United States*, 208 F.3d 41, 45 (2d Cir. 2000) ("'The ultimate decision whether to plead guilty must be made by the defendant."); *see also United States v. Harris*, Case No. 3:14CV32, 2017 U.S. Dist. LEXIS 30737, at *19–20 (E.D. Va. Mar. 3, 2017) (applying *Purdy* in the Eastern District of Virginia); *Mayes v. United States*, No. 7:07cv00132, 2007 U.S. Dist. LEXIS 93126, at *28-30 (W.D. Va. Nov. 20, 2007) (also applying *Purdy*). Virginia Rule of Professional Conduct 1.2(a) mandates that a "lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered . . .'" Counsel "must take care not to

coerce a client into either accepting or rejecting a plea offer." *Purdy*, 208 F.3d at 45. In fact, defense counsel is not obliged to recommend a plea agreement at all, let alone convince a client to change their mind. *Id.* at 48; *Jones v. Murray*, 941 F.2d 1106, 1110–11) (4th Cir. 1991). This is especially true for a client who maintains their innocence, and Lewis maintained his innocence throughout the case. (Sent. Tr. 41); *George v. Clarice,* 2019 U.S. Dist. LEXIS 130650, *22–23, 2019 WL 3557344. Nevertheless, Counsel took time to explain, in detail, the risks of trial and the benefits of the proposed agreements. (Aff. of Counsel 2–3, Ex. B.). Counsel reviewed this information with Lewis several times, both verbally and in writing. (Aff. of Counsel 2–3, Ex. B.). Counsel "repeatedly strongly urged [Lewis] to take the reasonable offers put forward by the Commonwealth," and correctly predicted the outcome of the case, should Lewis refuse the plea offers. (Aff. of Counsel 2-3); (Aff. of Pet'r 2). Counsel's conduct met and exceeded the standards required by law as well as Virginia's Rules of Professional Conduct.

Just as it is unreasonable for an attorney to fail to inform a defendant of the risks of trial, it is also unreasonable for an attorney to fail to inform a defendant of the consequences of a plea agreement. Lewis, without citation to any authority, argues that Counsel should have told him that "felons can now easily reclaim their right to vote" and that he "could petition the Court to relieve him of the obligation to register as a sex offender." (Pet. 10). However, each of these statements is misleading, particularly the implication that a twice-convicted sex offender would easily be able to be removed from the registry. (Sent. Tr. 37 & 42).

## II. Lewis cannot establish that he would have accepted the Commonwealth's offer or that the Court would have accepted his plea pursuant to such a plea bargain; his claim therefore fails under *Lafler*.

As addressed above, Lewis was sufficiently counselled regarding the plea offer. Lewis's claim also fails because, *Lafler* requires Lewis to establish prejudice by showing a reasonable probability that he would have otherwise accepted the plea offer, and that this Court would then accept his plea. *Lafler*, 566 U.S. at 171. When making this determination, the Court considered Lewis's own admissions, the affidavit of counsel, the plea colloquy, Lewis's rejection of the subsequent offers, and Lewis's persistent unwillingness to accept responsibility. *See* Va. Code § 8.01-660; *Lafler*, 566 U.S. at 171; *Blackledge*, 431 U.S. at 74; *Smith*, 291 Va. at 265. Lewis's assertion that he would have accepted the Commonwealth's offer if he had been more forcefully counselled to do so is inherently incredible once these factors are considered.

Counsel reviewed the Commonwealth's offer with for "about two hours," advising him that he could be sentenced to twenty years of penitentiary time and telling him, "Don't play a game like this with your life." (Aff. of Counsel 2). Counsel further reviewed a document with Lewis, detailing the benefits of the Commonwealth's offer and risks of trial. (Aff. of Counsel, Ex. B). Lewis admits that Counsel told him that "it was a good offer and if I went to trial and was

14

> convicted, I could be sentenced to twenty (20) years or more in prison." (Aff. of Pet'r 2). Nevertheless, Lewis rejected the offer.
>
> This Court questioned Lewis regarding the Commonwealth's offer prior to trial. (Trial Tr. 10). Lewis reiterated that he had considered the offer and wanted a trial. (Trial Tr. 10). Lewis also rejected a subsequent offer as the jury deliberated. (Aff. of Counsel 3). Lewis has not proffered any reason, much less a valid one, for controverting the statements that he made prior to trial. *See Anderson*, 22 Va. at 516, 281 S.E.2d at 888.
>
> This Court noted at sentencing that Lewis had never accepted responsibility or admitted guilt in the case. (Sent. Tr. 41). In statements to Probation and Dr. Nelson, Lewis maintained that he was convicted on perjured testimony, that his lawyer had failed to properly challenge the evidence at trial, that the jury had gotten things wrong, and that he should have been exonerated at trial. (Sent. Tr. 41). Lewis refused to express any acceptance of responsibility or remorse even after he had been convicted and a demonstration off remorse could have resulted in a more lenient sentence. (Sent. Tr. 41.)
>
> These facts show that Lewis wanted to proceed to trial regardless of his attorney's counsel. Lewis has never demonstrated any inclination to accept responsibility or plead guilty in this case prior to his second affidavit. (Supp. Aff. of Pet'r). A belated statement by a prisoner who has "everything to gain and nothing to lose" cannot overcome trial counsel's affidavit and the entirety of court's record. *See Blackledge*, 431 U.S. at 71–72 (quoted in *Smith*, 291 Va. at 265). Furthermore, this Court commented at sentencing, "It's his age and only his age that compels this Court to sentence within the [nine years and ten months to twenty-one years and one month Sentencing] Guidelines." (Sent. Tr. 42). Lewis has failed to meet his burden to establish either prong of the *Strickland* test.
>
> . . .
>
> Lewis has failed to make the necessary showing to pursue his habeas corpus claims and his claim otherwise fails as a matter of law. The Court, therefore, is of the opinion that the petition for a writ of habeas corpus should be denied and dismissed; it is, therefore, **ADJUDGED** and **ORDERED** that the petition for a writ of habeas corpus, be, and hereby is, denied and dismissed with prejudice.

(ECF No. 10-5, at 7–14 (alterations in original).)

The Circuit Court's rejection of Lewis's ineffective assistance of counsel claims was eminently reasonable. *See* 28 U.S.C. § 2254(d)(1)–(2). The law rather strongly teaches that it is the client who "ultimately must decide whether to accept or reject a plea offer." *Mann v. United States*, 66 F. Supp. 3d 728, 739 (E.D. Va. 2014); *see Purdy*, 208 F.3d at 45 (citation omitted) (noting that "the ultimate decision whether to plead guilty must be made by the defendant"); *United States v. Dailey*, Nos. 3:09–CR–233–3, 3:12–cv–362, 2013 WL 1768053, at *4 (E.D. Va.

Apr. 24, 2013) (noting that "the professional norms surrounding plea negotiations require defense counsel to[, *inter alia*,] permit the client to make the ultimate decision" (quoting *Clark v. United States*, No. 07cr281, 2012 WL 253436, at *2 (D. Md. Jan. 26, 2012))). The lawyer is to advise about options. *See Jones v. Murray*, 947 F.2d 1106, 1111 (4th Cir. 1991). And, in so doing, defense counsel is not obligated to recommend a particular choice, or to press the client to change his mind or pressure the client into one choice or the other. *Id.*; *see also Purdy*, 208 F.3d at 45 (citations omitted) (noting that "a lawyer must take care not to coerce a client into either accepting or rejecting a plea offer"); *Carillo-Morales v. United States*, 952 F. Supp. 2d 797, 804 (E.D. Va. 2013) (concluding that "an attorney is under no obligation to recommend a particular course of action to a client" (citing *Jones*, 947 F.2d at 1110)); *Jackson v. United States*, 638 F. Supp. 2d 514, 580 (W.D.N.C. 2009) (concluding that ineffective assistance does not occur when "counsel deci[des] 'to refrain from a vigorous attempt to change his client's mind'" (quoting *Jones*, 947 F.2d at 1111)). The Circuit Court's conclusion that counsel performed competently was reasonable. Accordingly, Claim A will be DISMISSED.

Furthermore, for the reasons stated by the Circuit Court, Lewis cannot establish that he would have accepted the Commonwealth's offer or that the Circuit Court would have accepted his plea pursuant to such a plea bargain. "A defendant who maintains his innocence at all the stages of his criminal prosecution and shows no indication that he would be willing to admit his guilt undermines his later [habeas] claim that he would have pleaded guilty if only he had received better advice from his lawyer." *Sanders v. United States*, 341 F.3d 720, 723 (8th Cir. 2003) (citing *United States v. Stevens*, 149 F.3d 747, 748 (8th Cir. 1998); *Engelen v. United States*, 68 F.3d 238, 241 (8th Cir. 1995)); *see Chesney v. United States*, 367 F.3d 1055, 1060 (8th Cir. 2004). In this regard, Lewis did not merely stand on his right to require the prosecution to prove his guilt. Instead, Lewis took the stand and disputed the evidence which reflected that he

had raped and digitally penetrated the victim against her will. Given these circumstances, Lewis fails to demonstrate any reasonable probability that he would have accepted the plea offer had he received better advice from counsel. *See Jackson*, 638 F. Supp. 2d at 581–82. Accordingly, Claims B and C will be DISMISSED.

## V. CONCLUSION

Respondent's Motion to Withdraw and Submit a Substitute Brief (ECF No. 9) will be granted. The Motion to Dismiss (ECF No. 6) will be granted. Lewis's claims and the action will be dismissed. A certificate of appealability will be denied.

An appropriate Final Order will accompany this Memorandum Opinion.

Let the Clerk file a copy of the Memorandum Opinion electronically and send a copy to counsel of record.

_____/s/_____
David J. Novak
United States District Judge

Richmond, Virginia
Date: October 25, 2024